Ms. Haddock, we'll hear from you first. Good morning, Your Honors, and may it please the Court. My name is Sheila Haddock and I represent the appellant, Jane Roe, in this case, the plaintiff in the case below. During my time before the Court today, I will explain how the District Court erred when it granted summary judgment on the eve of trial dismissing Ms. Roe's claims for defamation and negligence against Southwestern Baptist Theological Seminary and its former president, Paige Patterson. The record in this case is voluminous. There are four motions for summary briefing and hundreds of exhibits. Subject to the Court's questions, I would like to focus my argument today on two of Ms. Roe's claims. First, Ms. Roe's defamation claim against Dr. Patterson, specifically the issues of agency and ratification. And second, Ms. Roe's negligence claim against Southwestern Baptist, because I believe that's the claim that the facts are most disputed and the record is most evident. The credibility issues that plagued this case are most evident with regard to that claim. That's the negligent hiring claim? It's a negligence claim under the Texas multi-factor duty test. Both admission and hiring in the instance of the facts of this case? Yes. Yes, Your Honor. So first, turning to the defamation claim and the specific issue of agency, the Court below struggled with finding an agency relationship with any of the authors of three of the major publications that we claim were defamatory. And those publications are included in the record excerpts, so I'll be referring to those, and they are excerpts 8, 9, and 10. But a mistake that the lower court made that I think bears highlighting is agency, under Texas law, someone is authorized, an agent is someone authorized by a person or entity to transact business or manage some affair for that person or entity. The District Court struggled with finding any support for finding that Scott Coulter, Shelby Sharp, less so, but particularly Scott Coulter was an agent of Dr. Patterson because Dr. Patterson was an individual. This Court in Texas Soil Recycling Inc. v. Intercargo Insurance cited the restatement third of agency, section 101, for that very proposition, that agency can be found outside of any traditional agency relationship like employer-employee. And that was one of the focuses for the Court below was whether there was evidence in the record that Mr. Coulter was an employee of Mr. Patterson during this May 31st to June 29th time frame that these three publications were focused on. The second important thing to keep in mind with agency is the question of agency is a fact issue. Agency can be found as a matter of law, but the converse is not true. You can't find as a matter of law that agency did not exist because agency necessarily depends upon the facts and circumstances surrounding the relationship, the representations made to others. So it was agency can exist as a matter of law if there is a contract or an employee-employer relationship and those sorts of traditional relationships. But outside of that, it's a question of fact. So looking at the facts in this case, particularly focusing on Mr. Coulter because he was the person who directly and intimately involved in all three of the publications, and by those publications I'm referring to the Untold Truth, which was an article with the byline of Sherea Coulter, which was Mr. Coulter's wife. The second was the Shelby Sharp release of facts, which was Mr. Sharp was at the time, and as far as I know may still be, Mr. Patterson's personal attorney, and then the June 29th donor letter that was signed by a group of 18 wealthy donors. So if we look to the record about what Mr. Coulter's involvement was and what his association with Mr. Patterson was during that time, Coulter was a student and employee at Southwestern Baptist. He began working directly with Dr. Patterson in 2016 and took on the role of chief of staff. In that role, he maintained oversight of the president's office, the president's home, and was a member of the president's cabinet. Scott Coulter attended the May 22nd, 2018 board meeting with the Board of Trustees of Southwestern Baptist as a member of Dr. Patterson's cabinet. He was present during the discussion about the issues that were arising, and I'm kind of leaping because I'm assuming that the Court is familiar with the record and the meetings that we're talking about, the two meetings that we could—so I'm kind of assuming that you know all that. So the May 22nd, 2018 board meeting, which was the meeting where the board voted to move Dr. Patterson into the position of president emeritus. Mr. Coulter was there and present as a member of Dr. Patterson's cabinet. He continued to maintain, after Dr. Patterson was moved to president emeritus, he stayed on, employed by Southwestern, but working directly with Dr. Patterson as his chief of staff, doing the same duties, helping him with the transition that was being anticipated. Shortly after the meeting, the May 22nd meeting, he traveled to Germany with Dr. Patterson on a Southwestern trip, and on May 30th, when Dr. Patterson was terminated by the executive committee, Scott Coulter was with Dr. Patterson in Germany. As a—I'm going to skip ahead and then come back. When Scott Coulter was terminated by Southwestern, he continued to work on payroll until July 31st of 2018, and at that point, he became employed by Sandy Foundation, which he was the president and his wife was the vice president. And he took on a similar title and similar role with the foundation. But throughout this time, he continued to work, and the record is replete with testimony by various people that during this entire time, Mr. Coulter never stopped acting as Dr. Patterson's chief of staff. What's the defamatory statement you want to impute to these individuals? Let's assume we've gotten past the agency issue for conversation's sake. What's the defamatory statement you'd like us to focus on? If we turn first to the untold truth, which is in the record excerpts at 9. Did you say 9 or 18? It's the record excerpts tab 9—tab 8, I'm sorry. I'm sorry. And the—it's record at 8,014. Wait, I'm sorry. That's not true. Accusation number two in the untold truth is the accusation that relates to Ms. Rose. The accusation is Patterson did not handle appropriately an alleged case of sexual assault against a Southwestern Baptist student. Truth. Patterson immediately called police in response to a female student claiming she had been raped. The accused man admitted to having sexual relations with the woman, but said it was consensual. The man also produced evidence to the police to that effect. Southwestern's chief of police can confirm that the Fort Worth Police Department— I want to—in the interest of your time, what's the defamatory statement? We have the paragraph— The accused man admitted to having sexual relations with the woman, but said it was consensual. The man—and this is the key—the man also produced evidence to the police to that effect. That's untrue. And how we know that Mr. Coulter was— I assume this is a reference to the photos? Yes. And the testimony of Dr. Candy Finch, Sherea Coulter, Scott Coulter's wife, and Scott Coulter, all in their depositions, all denied knowing what the source of that statement was. They all agreed that they were all involved in the drafting of it during the overnight hours from May 30th to May 31st, but none of them would acknowledge which one of them provided that piece of information. And the only thing that they did admit was that Scott was responsible for the next paragraph sentence, Southwestern's chief of police can confirm that the Fort Worth Police Department was called and responded, because they acknowledged that Scott added the word can confirm to make that statement more accurate. Now, on the morning of May 31st, Scott texted with Mark Howell, who was Dr. Patterson's son-in-law, who called the article outstanding, because at this point it had come out. Scott was still in Germany with Dr. Patterson, and Scott wrote, I'm glad you're hearing it's creating quite a stir. He'll be encouraged to hear that as well. We cannot tell from here that it's having much of an impact. On the same day, May 31st, before the article came out, a reporter from the Baptist Press contacted Scott asking for comment from Dr. Patterson about his termination that had just occurred, hours before. Scott responded by text that something significant, a significant piece was coming out soon, and offered this reporter from the Baptist Press a 30-minute head start if he would agree to publish the article in its entirety. You've got less than four minutes. Do you want to stay on this issue, or do you want to switch to negligence? It's up to you. This is so important, and I think the court ignored so much of the evidence involving Scott Patterson, and just summarily found that there could be no agency, because there was no employer-employee relationship. And then particularly, if we turn to the donor letter, those statements are defamatory per se. I think that that is without question, and in fact, neither Southwestern nor Patterson even raised the issue of whether these statements were defamatory or not. That was not an issue that was briefed in the court. What is your theory that it's defamatory per se, which, you know, there are a couple of different prongs? It accuses her of sexual misconduct. It accuses her of a crime. If we turn to the donor letter, the language is very strong, and the record reveals evidence that Mr. Coulter was the source of this information. If you read all of the e-mails— What is this—you said two prongs, sexual misconduct and crime. What is the theory of sexual misconduct that you're putting forth to support defamation per se, sex outside of marriage? Ms. Rowe was a student at a seminary. She was intended to— Is there any case—I guess we're focusing on Texas law, but I'd be curious if you have any case that would suggest that that's enough to constitute sexual misconduct for purposes of defamation per se. Yes, Your Honor. Marshall v. Mahaffey, 974 SW 2nd 942 is a Texas Court of Appeals case where they found that imputation of sexual misconduct is slander per se and actionable without proof of damage. And in that case, they called the plaintiff a slut and a gold digger. There was also— Do we have that here? Do we have— Those terms that you used, are those being used— They're worse here, actually. Especially if you take into— What do you mean by worse? As you know, with defamation, we have to be very specific about the statement. The very specific—the statement is that she lied about being raped, that she gave a false statement to the police, that she had sex in public places on a seminary. And taking into account the victim herself, she was a virgin. She had attended seminary with the hopes of meeting a husband, hopefully a preacher that she could build a home with. And she had her own ministry. She went frequently on mission trips. So it completely destroyed her credibility. And the cases indicate that she—defamation per se is a statement that affects a person in their employment, their profession, or their calling. And this was certainly a calling that she had to ministry. And for this to be publicized in the way that it was—and she was called a liar, sexually promiscuous, that she had violated the—not only just the morals and values of the seminary, but completely was also a criminal. So the crime is lying to the police. Yes. That's the crime part. Thank you. You've reserved five minutes for rebuttal. Yes. Mr. Jones, we'll hear from you. Mr. Jones. May it please the Court. My name is Travis Jones, and I represent Dr. Layton Paige Patterson in this appeal. I want to begin with the issue that Ms. Haddock addressed, which is essentially this threshold issue as far as vicarious liability for defamation. The existence of an agency relationship and whether there was defamation that occurred within the scope of that relationship. Now the Court's been presented with, and the trial court was presented with, evidence of the conduct of these alleged agents. But the critical inquiry into a principal-agent relationship is the issue of consent. Did the principal consent to the relationship? And, if so, what was the scope of that relationship that the principal consented to? Ms. Haddock began with the issue of Mr. Coulter, Ms. Coulter, a candy finch. There's no evidence in this record that Dr. Patterson authorized them to make a public statement on his behalf, that he knew that they were working on a public statement on his behalf. The only evidence— Just to clarify, are you—as I understood the district court's reasoning and in the briefing here, are you conceding that the supposed or alleged agents were in fact agents, but the scope of their agency did not include anything, any tortious conduct committed? Are you disputing that there was any agency relationship whatsoever? It depends on the individual. For Sherea Coulter, one of the authors of The Untold Truth, there's no evidence of an agency relationship in any manner at all. As far as for Scott Coulter, the evidence is that he participated in administrative duties for Dr. Patterson, but that he was not authorized to make public statements on Dr. Patterson's behalf. So it's a limited scope agency. For Ms. Finch, it's even more limited. She was authorized to go retrieve a letter from Dr. Patterson's file. So to the extent that an agency relationship exists, it's limited to that specific transaction. As far as these other individuals, Gary Loveless, Susan Pearson, who wrote the Loveless letter, which we're not arguing on appeal as to whether it's defamatory or not. Our position is that there's no evidence at all that this letter was published in some form of agency relationship. The agency did not exist there. What case can we look at? It sounds like you're drawing the contours of the agency relationship in a way that would exclude the allegedly tortious conduct here. But we don't have any writing or anything that specifically or expressly confines the agency. We just have, I assume, some evidence that says, well, they never were employed as an agent to do X, Y, and Z before, so we should not imply that they had the authority to do that now. What case can we look at that would support a fact-finding at this stage that their agency would not have possibly included what happened here? Yes, Your Honor, and I'll cite two different propositions for that point, the first just being the general rules of agency. And for there to be an agency relationship, you have to have the express or apparent authority. And then also, did the statement occur within that consented to authority and to accomplish the objective of that agency? And the case that we've cited this court to is Blackwell v. Ship Channel Development Company. It's a Texas Court of Appeals case out of Beaumont. And what happened in that case is factually similar to the attorney-client agency relationship that existed here. We have a real estate agent who was authorized to go out and sell properties on behalf of the principal. In the course of doing so, he made allegedly slanderous statements about the plaintiff. Now, what the Court of Appeals found there is he was specifically authorized to sell these properties. But as far as committing a tort, committing this intentional tort against this plaintiff, that was beyond anything that was anticipated. He had the control and direction for the means and methods of how that real estate relationship would actually work, how the properties would be sold. And in his own discretion, he made these allegedly slanderous statements. I'd also cite this court to Harris v. Mastek, which supports the long-running rule of law that if you do have an intentional tort, it's presumed to be personal. It's an expression of personal animosity on behalf of the individual who actually makes the statement. So when we have this personal animosity exception to the typical rules of agency, it's not within the scope of that agency, and it's not to further the objective of that agency. It's separate and apart from that agency relationship. And, Your Honor, that's what we believe we have here, because Dr. Patterson, again, did not authorize, agreed to, participate, or have knowledge of any of these alleged statements. The evidence is that these statements were actually made against his wishes, that the individuals who participated in all of these statements knew that he would not have wanted them to go forward, but did so anyways in their individual capacity. So to the extent that an agency relationship did exist, none of this conduct was to further that relationship in any way. None of it was to accomplish the objective of that agency. And, Your Honor, specifically to this attorney-client relationship as well, we understand that this is an agency relationship. An attorney, when hired, is hired to manage some transaction or some affair on behalf of the client. And the district court was correct in concluding that an agency relationship existed. But it's that next inquiry that we disagree with the district court on, is, is this amatory conduct referable back to the client when there's no authorization or consent for this defamatory language to be used? Why aren't these all fact issues for a jury? Well, Your Honor, as far as the facts in this case, there's no evidence at all tying any of these statements to Dr. Patterson. So without any evidence, any genuine issue of material fact, summary judgment was appropriate. Why is it the agency issue of, you're saying it's a legal dispute, but opposing counsel describes it a fact dispute. Why is it not a fact dispute? Yes, Your Honor. And I'd cite this case in court to Ross v. Texas One Partnership. The district court actually did cite this case in their opinion as well. And in that case, what it supports is that the question of agency is actually one of law when there's well-established facts. So what we have here are well-established facts. We have a summary judgment that was heard months prior to trial. We have the granting of the summary judgment on defamation the Friday before trial was to begin. We have significant record excerpts in this record. And based on all of that evidence, there is no evidence at all of tying Dr. Patterson into an agency relationship for the purpose of committing these publications. So Your Honor, based on the existing law, based on the lack of any evidence, that's what we believe supports the separation of Dr. Patterson from these alleged defamatory statements. Counsel, do you agree with your opponent that publicizing an accusation that someone is either sexually promiscuous or has committed the criminal act of lying to law enforcement are defamatory statements? Your Honor, as far as the expressed statement of someone lying to law enforcement and committing a crime, we would agree that if that's untrue, that would be defamatory. Where that comes up is in the Loveless Letter, which again is entirely segregated from Dr. Patterson. As to whether someone engaged in consensual sexual activities, we don't believe that that rises to the level of defamation per se. It doesn't fit one of the four categories that would be required there. It's not imputing a crime, a loathsome disease. Essentially what you have there is you have again a fact question. You have this relationship between two individuals on campus with no external evidence of whether or not a sexual assault had occurred in the past. It's essentially the prototypical he said, she said situation. So for individuals who are one, in fact . . . I thought the theory was that there's a sexual conduct prong to defamation per se that this fits in. I don't believe that this fits in within the sexual misconduct prong of defamation per se. Sexual misconduct would rise to the level of calling someone a pedophile or saying that they committed rape. But simply engaging in sexual activities, that doesn't rise to the sexual misconduct. I think opposing counsel noted a case where an allegation of promiscuity was enough. Yes, Your Honor, and I believe that there is case law that does support a situation where an individual that committed adultery and an alleged defamatory statement about that adultery was found not to be defamatory per se because again for the same reasons. Although they're making a statement about the sexual conduct of someone, it's not alleging certain sexual misconduct that rises to the level of defamation per se. And Your Honor, just to address this issue of attorney-client agency, and I want to focus in on the relationship with an attorney. Because us all as attorneys, when we're hired on behalf of a client, we're hired for a limited scope. And attorneys, we have the means and methods of controlling that scope much akin to an independent contractor. Attorneys are also bound to professional rules of conduct. We're responsible for the words that we say. A client cannot control the words that we say. They are only looking at the end result or in certain cases, specific ways of getting to that end result. But in this situation where you have an attorney speaking one, on their individual capacity, and two, making allegedly defamatory statements, we do not believe that that can be imputed back to the client. In these circumstances, without the client's either authorization or consent for those defamatory words to be used. And Your Honor, we think that's the standard as far as if defamation is to be referred back to the client, that that's what's required. And that's the inquiry that plaintiff faced here. That's the questions that was asked of all of these individuals was, were you authorized to make these publications in any way? And Your Honor, the record evidence is that there's no evidence tying Dr. Patterson to any of these alleged defamatory statements. Nothing occurred within the scope of the agency relationship. Thank you, Your Honor. Thank you. Mr. Rutherford? May it please the Court, my name is Brian Rutherford and I represent the Applee Southwestern Baptist Theological Seminary. My opponent touched on negligence with respect to my client and Judge Englehart, you asked specifically about with respect to Mr. Doe. The trial court applied the multi-factor test here and came to the conclusion that my client owed no legal duty with respect to the plaintiff, Ms. Rowe. There were several issues related to that that were addressed specifically in the trial court's opinion. Going to knowledge of Doe's prior criminal convictions, the suspicious student report in particular, and then what he described as the telephone game of notes between Rowe, Doe, Lenny Knight, Dr. Knight and alleged stalking behavior. I've gone through the record, I've noticed that there were some mistakes in the trial court's opinion with respect to the citation. I'd like to cite those specifically. With respect to the alleged stalking notes, those are found at ROA 103-96, paragraph 17, and then attached 10-412 through 10-421. I think there was just a numerical error there in the opinion. The trial court reviewed the notes themselves and found that none contained threats of violence or otherwise suggest that Rowe was in danger of a potential sexual assault at the hands of Doe. I think that's the critical factor to focus on with respect to foreseeability. If we're looking at what is this individual, what did Southwestern Baptist know at the time that he was admitted and then later at the time he was a student employee, we've got to look at what his criminal history was. What is known to everyone, what is undisputed, is he had a history of drinking through 2011. We know that. What that does not show under the case law, under Texas case authority, that we get from drinking to then any foreseeability with respect to a sexual assault. The notes themselves, as I cited, are in the record. The trial court described them as a rollercoaster of emotions, but again, nothing in the notes themselves that would indicate any type of threat, any type of specifically sexual assault. With respect to the Suspicion Student Report, the trial court noted that it provides no information that it would allow a fact finder to conclude that the seminary was unknown to us, that Doe presented any danger to fellow students. The Suspicious Student Report is found at ROA 101-92, and it specifically describes a gentleman who had lost his keys. He's a student, and he wants to speak specifically to the head of security. It's not noted in the report why he wanted to speak to the head of security. We know that he did. That's reflected in the report, and that the incident was cleared without any further concerns on behalf of the security team, the head of security, or on behalf of the seminary. With respect to the third issue that was addressed is knowledge of prior convictions. Gone through the appellate references on those, 6454 through 6456. Again, criminal history was listed to alcohol and drug-related offenses. Before the trial court, the record was a little hazy on one point. I'd like to clarify that. With respect to the recommendations that were made on behalf of the student, there's a document 6454, and it's a two-page document. It's a printout. I didn't enlarge it, but it shows church reference, personal reference, and then personal reference going on to the second page. The plaintiff has made a, tried to make some hay with respect to church recommendation, that being the overarching factor in whether a student should be allowed to attend. It says pending on the document. The very next page in the reporter's record is 6456, which is actually the church record for admission. Throughout the argument, both in the court below and here, the plaintiff makes, again, some hay about, it says it's pending. It says they ask questions about you didn't actually call someone at First Baptist Church Purcell, which was the church recommendation. In fact, we have the document. We have it at 6456. It was filled out by a gentleman named Michael Dillinger, who was the deacon of that church. To the extent there's an argument that we rely heavily on the church recommendation, that it was absent, it is absent from the printout. It is not absent from the record. With respect to the personal recommendations themselves, that was what was, a great deal of time was spent on a gentleman named Todd Thiessen and a gentleman named Thomas Uzbeginim. They described the detail in which they had known Mr. Doe, that they had known him through church, that they had known him through those types of activities, and they recommended him. They also said he is rough around the edges. That is not indicative of the type of criminal behavior that we have at issue here. With respect to the duty analysis, whether one party would have generally superior knowledge of the risk, the trial court cited Elephant Insurance Company, a Texas Supreme Court case from 2022, and the trial court said, even assuming the sexual assaults took place, there's no question that Roe herself had appreciably more knowledge of the risk than Doe posed to her and did the seminary. That is particularly prior to the first alleged assault. With respect to the notes that are at issue, the plaintiff puts an issue. The trial court noted that the record reflects that Doe and Roe spoke for extended periods of time by phone prior to and after the first alleged assault, that Roe accepted flowers from Doe, and that she voluntarily attended the October 2014 party where she alleged she was first assaulted. By no later than that first assault, Roe herself testified that she was aware that Doe possessed firearms, but she never apprised the school of that at any time prior to August 20, 2015. That's a bright line date. With respect to failure to supervise, the case law on this under Texas law is clear under Boys Club and related cases that allegations that do no more than show that the seminary furnished a condition which made the injury possible in no way justifies the conclusion that the injury was a natural and probable result from that. With respect to foreseeability, we argue, as we did in the trial court, that there is no duty owed by the seminary to Ms. Roe to supervise John Doe. We've addressed in the brief the other issues with respect to Dr. Patterson and the dates involved. I would simply draw a bright line with respect to the defamation as well. Dr. Patterson went from president status to president emeritus status May 22, 2015, then was terminated May 30, 2015. So there's a bright line there with respect to defamation. And I would ask the court to affirm the summary judgments in favor of my client, the seminary. Thank you. Thank you. Ms. Haddock, you have five minutes. First, addressing Dr. Patterson's comments a few minutes ago that Scott Coulter was never authorized to make public statements, that he was merely an administrative assistant. And it's simply not true. And there is record evidence in a number of places that indicate that he was a public, he was Mr. Patterson, Dr. Patterson's spokesperson, both before these publications and after. And in fact, he continued to be, even after this litigation began. And in the record, we have evidence that he republished the untold truth and the sharp release of facts as recently as 2020. So that's simply not borne out by the record. I think the Southwestern's counsel makes Ms. Rose's point for her with the references to the record evidence and clarifying record evidence and the comments that Ms. Roe made hay with certain things demonstrates that fundamentally, at bottom, this is a fact issue. Every issue in this case comes down to a fact issue. There is evidence that the defendants simply did not meet their summary judgment burden. Simply filing a summary judgment does not entitle a party to summary judgment. There has to be evidence that there is no fact taken in the light most favorable to the plaintiff and indulging every inference in her favor that there is not, she can't prevail, that no reasonable jury could find for her. I think one thing that Southwestern's counsel did not address, and what I did not in mind either, but we addressed fully in the briefing, are the credibility issues here, that even among the defendant's witnesses, no two witnesses tell the same story about anything. For example, Dr. Patterson in his deposition did not recall meeting, ever meeting John Doe. He did not recall having any involvement, and yet in his affidavit that he relies on heavily in his summary judgment motion, he declares that he never spoke to John Doe about Ms. Rowe, that he never met with him about his allegations. He never did anything, and yet we have evidence from others, from Southwestern's witnesses, that they were present. For example, the chief of police at the time, John Nichols, testified in his deposition that he was present in a meeting with Dr. Patterson and Mr. Doe, and that Dr. Patterson did all of the talking. And so there are disputed fact issues, even within just the testimony that was offered in support of the defendant's motions for summary judgment. And this Court has told us that in cases like that, summary judgment is simply not appropriate. Recently, in Rowe v. Cypress-Fairbanks ISD, a panel of this Court observed that when, that the defendant fails to meet his summary judgment burden, when a jury could just as easily disbelieve its version of events, that they've proffered. The Supreme Court denied cert in that case on February 20th of 2024. It's also not unlike another decision from a panel of this Court, Doe v. William Marsh Rice University, where the Court, this Court, a panel of this Court observed that the district court's consistent discounting of the plaintiff's account and evidence underscores that it didn't view the evidence in favor of the plaintiff, as Rule 56 requires. So if we go back 20 years to another Fifth Circuit opinion, I'll leave the Court with this. When circumstantial evidence supporting the nonmoving party is this strong, and the only direct evidence supporting the nonmoving, or the moving party, is this suspect, and I refer again to the briefing that is voluminous, and I understand that of the credibility issues, the merits of the case that turn on causation, in particular, have to be decided by a jury. Ms. Rowe respectfully requests that this Court reverse the district court's grant of summary judgment on her claims against, for negligence against Dr. Patterson, her claims for defamation against Dr. Patterson, her claims for negligence against Southwestern, and her claims for defamation against Southwestern. Thank you. We have your case.